## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BARBARA HACK,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-2410-JAR** |
| **CITY OF TOPEKA, KANSAS,** | |
| **Defendant.** | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Barbara Hack brings this action alleging that her former employer, Defendant City of Topeka, Kansas ("the City"), discriminated against her because of her gender in violation of Title VII when it failed to promote her to a Topeka Fire Department Division Chief position. Before the Court is the City's Motion for Summary Judgment (Doc. 79). The motion is fully briefed, and the Court is prepared to rule. For the reasons stated below, the Court denies the City's motion for summary judgment.

## I.        Summary-Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[1] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[2] A fact is "material" if, under

---

[1] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[2] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

non-moving party."[4]

The moving party must initially show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

rather, the movant need simply point out to the court a lack of evidence for the other party on an

essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party

may not simply rest upon its pleadings to satisfy this burden.[8]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be

---

[3] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[4] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[5] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Celotex*, 477 U.S. at 324.

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (2000)); *see also Kannady*, 590 F.3d at 1169.

identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[11]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[12]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

### *Topeka Fire Department Structure and Leadership*

At full strength, the Topeka Fire Department ("TFD") employs around 244 uniformed positions.  Under Topeka's Municipal Code, only entry-level firefighters and the Chief may be hired from outside the TFD; all other vacancies must be filled from within the TFD.  After initial hire, a firefighter takes a promotional exam at the end of each of the first three years and, upon passing, automatically promotes up to the next level.  After reaching advanced status (the third year), the firefighter must pass additional exams and wait for a vacancy before promoting to Apparatus Operator, then Lieutenant, then Captain.  Upon passing the exam, promotion is guaranteed, but the timing is determined by seniority and ranking of the test score.

---

[10] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.3d 1022, 1024 (10th Cir. 1992)).

[11] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[12] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

Several other bargaining-unit positions within the TFD are considered "specialty positions." After completing a probationary year, the specialty employee may take a test and promote twice automatically. Specialty level III employees do not supervise others. But specialty Level III is considered equivalent to a Captain-level rank on the "suppression" side of the TFD.

High-level management or command positions within the TFD require a successful application and interview process. These positions are not covered by the contract between the City and the International Association of Firefighters Local 83 (the "Union") but are subject to the City's Personnel Manual. Except for the initial transfer into specialty, the Fire Chief (hired by the City Manager), and the Deputy Fire Chief (appointed by the Fire Chief), there are 16 positions that use merit-based selection: Battalion Chief (9), Shift Commander (3), and Division Chief (4). Merit-based selection involves a competitive interview process uninfluenced by seniority.

The Fire Chief is the highest-ranking position at the TFD and has final decision-making authority, subject to civil-service rules and regulations, and the Union contract. The Fire Chief reports directly to the City Manager for the City of Topeka, who reports directly to the Topeka City Council. The Fire Chief is the ultimate decisionmaker for the TFD, in consultation with the City's Human Resources ("H.R.") Department. Jacque Russell, an African American female, was the Director of Human Resources for the City of Topeka from 2008 until 2023.

### Plaintiff's Employment History and Division Chief Vacancies

Plaintiff Barbara Hack was employed by the TFD for 24 years, from January 1999 to March 31, 2023. She promoted through the firefighter ranks, passing the Lieutenant exam in 2007, and the Captain exam in 2019. She was promoted to Lieutenant in 2012, and to Captain in

2019.  A Captain supervises three individuals: one Lieutenant, one Apparatus Operator, and one Firefighter.

In January 2022, then-Fire Chief Craig Duke created a special position for Plaintiff that allowed her to use her EMS and paramedic certifications to benefit the TFD through recruiting and training incoming firefighters.  Thereafter, Plaintiff transferred to the specialty side as a Training Officer without having to apply or interview.  She was paid at the highest level (Level III) in recognition of the equivalency to her rank as Captain.

In February 2022, Randall Phillips was promoted to Fire Chief, and Antony Standifer was promoted to Deputy Fire Chief.  Plaintiff previously worked in the same station with Standifer on different shifts.  During this time, Standifer made a derogatory comment about women that offended her, and after that, she tried to avoid him.

When Phillips became Fire Chief, the TFD had a number of vacancies in management, including all four Division Chiefs, and several Shift Commanders and Battalion Chiefs.  This number of command-position vacancies was unprecedented in the history of the TFD.  In March 2022, the TFD posted openings for all four Division Chief positions: Division Chief of Administration, Fire Marshal, Division Chief of Operations, and Division Chief of EMS/Training.  This was the first time Phillips and Standifer conducted a recruitment and promotion process on this scale.  Phillips discussed the open Division Chief positions with the Interim City Manager, Bill Cochran.  Phillips understood that Cochran approved a single, streamlined application process for all four Division Chief positions, which deviated from standard practice whereby each position was posted and applied for separately.  Phillips hoped that the four Division Chiefs could be interchangeable.

Cochran also approved a rank qualification of Captain, rather than Battalion Chief, the typical rank qualification requirement. There were so many command vacancies that the TFD did not have enough Battalion Chiefs to apply for the openings, so they had to drop down to Captain as a requirement for eligibility. Neither the TFD's internal Standard Operating Procedures nor its Standard Operating Guidelines dictated the qualifications or application process for the vacant Division Chief positions.

Thus, requirements for all four Division Chief postings, which were separate postings, included the following: "Applicants must hold the minimum rank of Captain for a minimum of two (2) years as well as twenty (20) years of firefighting experience. Applicants must have an equivalent combination of education, training and/or experience . . . to successfully perform the essential duties of the job."[13] The four positions required the same equivalent combination of education, training, and/or experience to successfully perform the essential duties of the job.[14] An associate's degree was listed as desirable, but not required. The email announcing the position openings directed applicants to "please specify what position or positions you are interested in."[15] Each separate job posting directed letters of interest and resumes to be submitted by email or hard copy.

### Application Process

Plaintiff met the minimum qualifications for the Fire Marshal and Chief of Administration positions and decided to apply. In addition to Plaintiff, TFD received the following applications for the Division Chief positions: Bruce Andruss, Jason Broadbent, Brent

---

[13] Ex. 22 at 2 (Doc. 79-23) (Fire Marshal); *see also id.* at 8 (Division Chief of Training/EMS); *id.* at 13 (Division Chief of Operations); *id.* at 18 (Division Chief of Administration).

[14] The Division Chief of Training-EMS requires a paramedic certification.

[15] Ex. 19, Standifer Dep. 36:17–19 (Doc. 79-20).

Dorsey, Chuck Gatewood, Ronald Rutherford, Paul Stafford, and Alan Stahl.  When submitting their application materials by email, each applicant specified to the City which of the four Division Chief positions they were applying for.  Plaintiff specified in her email attaching her application that she was interested in the positions of Chief of Administration and Fire Marshal.[16]  Stahl and Dorsey stated their interest in Chief of Administration and Fire Marshal. The other applicants specified which positions they were applying for.[17]  The other applicants for Chief of Administration and Fire Marshal were Stahl and Dorsey.

According to the resume Stahl submitted with his application, he had been with the TFD for 23 years, including 16 years in specialty, advancing to a Level III Fire Investigator, Training Officer, and Public Education Officer.  He did not supervise anyone in any of those roles, and he did not complete his bachelor's degree.  Stahl's resume also lists ten years of service with the Kansas National Guard, during which he had management experience.  When Stahl transferred to specialty, he did so in the rank of Lieutenant in suppression.[18]  Russell spoke to either Phillips or Shawn Maisberger in H.R. about whether Stahl was qualified to apply even though he did not have a Captain rank, and she advised that Stahl was qualified due to his equivalent experience on

---

[16] Ex. 50 at 12 (Doc. 88-1) ("I've included attachments of my Letter of Interest and Resume for the positions of Chief of Administration and Fire Marshal.").

[17] *Id.* at 2 (Gatewood: " I am attaching documentation for the Division Chief of Operations application process."); *id.* at 3 (Andruss: "This letter is to inform you of my intent to apply for the position of Division Chief of Training/EMS that was posted on March 22, 2022."); *id.* at 10 (Stahl: "Please consider my letter of application for the role of Division Chief of Admiration [sic] and Fire Marshal."); *id.* at 11 (Dorsey: "Included you will find my cover letter and resume for the Fire Marshal and Chief of Administration positions.  My first preference would be for the Fire Marshal, however I am willing to serve as the Chief of Administration if that is where it is felt that I would be a better fit."); *id.* at 14 (Broadbent: "Attached is my letter of interest for the Division Chief of Operations and my resume."); *id.* at 15 (Stafford: "I would love the opportunity to bring my skills as a detail-oriented leader to the position of Division Chief of Operations.").

[18] Plaintiff's hearsay objection to Stahl's resume is overruled and denied.  These facts are not offered for their truth but instead to show the facts as known to the hiring panel and Phillips.

the specialty side as a Level III officer.  When Stahl asked Standifer if he was qualified given the Captain-experience requirement, Stahl told him to go ahead and apply if he was interested.

### Interview Process

Rutherford withdrew his application, and the remaining applicants were interviewed on April 7, 2022, by a panel consisting of Clint Patty, Dave Anderson, Standifer, and John Paul Jones—all men.  Phillips chose all of the individuals to sit on the panel.  Standifer was the only internal representative on the panel; the other three were external representatives.  Patty is the managing partner of Clayton Wealth Partners and served as the TFD's union attorney from 1998 to 2016; Anderson is the Deputy Fire Chief of the Olathe Fire Department; and Jones is a retired Fire Chief of the Kansas City, Kansas Fire Department.  Maisberger attended and observed the interviews in her role as Deputy Director of Human Resources.  She did not interact with the applicants.  Phillips was not present for the interviews.

Each applicant was asked and evaluated on the same ten questions.  The questions were:

1.  As a Division Chief, you will be part of the Fire Chief's Executive Administration team.  How would you contribute to a positive team effort?

2.  Provide at least one example of how you have grown in your leadership ability as it relates to becoming a Division Chief.

3.  Describe your experience in working with the fire labor union.

4.  What leadership qualities or characteristics do you possess that would make you the best candidate for a Division Chief position?

5.  Describe how you communicate good and bad news.  What is your most effective communication style?

6.    It is a goal of the current TFD Administration to increase the department's professional development efforts for its members.  Describe what you think would be the most effective way to accomplish this goal.

7.    Recruitment of new applicants, especially minority recruitment efforts, is an issue of great importance.  Describe how you would help improve these efforts.

8.    In your opinion, what are the two (2) most important challenges facing the Fire Department?  How would you address these challenges?

9.    As a Division Chief, you may be asked to interact with representatives of other city departments, outside agencies, and the public.  Why is it important to have a positive relationship with these groups?

10.    Why do you want to become a Division Chief?[19]

Each interviewer used an identical score sheet and scored each person on a scale of one to five on each question.

The score sheet also asked the interviewer to rate each applicant on the following categories: response to questions, overall interaction skills, related knowledge for position, skills and experience for position, level of enthusiasm towards position, and presentation.  Applicants were rated either poor, fair, good, or excellent for each of these categories.  The panel members could include notes under each of the ten questions and scores, overall comments at the end of each score sheet, and turned over to the City any notes they took during the interview.

---

[19] Exs. 29–34 (Docs. 79-24 through 79-35).  The Court overrules and denies Plaintiff's objection that the interview notes must be excluded as inadmissible hearsay.  Summary-judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"  *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).  "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."  *Id.*  Defendant has submitted deposition testimony from all of the panelists that attest to the authenticity and accuracy of their notes.  And because these are the witnesses' prior statements, Defendants have shown it is possible to put the information into an admissible form at trial.  *See* Fed. R. Evid. 801(d).

The scores were tallied and totaled as follows:[20]

|  | Standifer | Patty | Anderson | Jones | Total |
|---|---|---|---|---|---|
| **Stahl** | 47 | 41 | 45 | 38 | 171 |
| **Gatewood** | 49 | 39 | 43 | 37 | 168 |
| **Broadbent** | 41 | 45 | 40 | 38 | 164 |
| **Andruss** | 45 | 41 | 41 | 34 | 161 |
| **Stafford** | 36 | 37 | 30 | 31 | 134 |
| **Hack** | 22 | 34 | 41 | 34 | 131 |
| **Dorsey** | 23 | 33 | 29 | 32 | 117 |

### *Standifer's Scores*

As noted in the above table, Standifer's scores for Hack and Dorsey were significantly lower than the other candidates and lower than the scores given to Hack and Dorsey by the other panelists. Standifer had general knowledge about all of the candidates prior to the interviews. He estimated that he factored this general knowledge into his score by 10%, although he could not explain how he decided to use that percentage. Standifer had a general impression, based on rumors and gossip he heard from members of her crew when she was Captain, that Plaintiff was inclined to only want to "do the bare minimum."[21]

With respect to Plaintiff's score, Standifer testified at deposition that her interview was "very unenergetic" and that she was "not overly interested in the way she presented herself, the way she answered the questions. Just not giving the—either the presentation or the way she

---

[20] Ex. 27 (Doc. 79-28).

[21] Ex. 21, Standifer Dep. 95:2–16; 97:16–20 (Doc. 79-20).

spoke or anything like that, the energy to show me that she really wanted one of those positions."[22]  Indeed, Standifer did not score Plaintiff higher than three on any one question.  On the rating scale at the end, he rated Plaintiff as "Poor" in "Related Knowledge for Position" and "Skills and Experience for Position."  His final comment was: "Used paper to help.  Answers were not really in Division Chief level."[23]  Standifer testified that Andruss had a representation for being unenergetic, yet Standifer gave him a score that was more than twice as high as Plaintiff's.

Prior to the interviews, Standifer heard rumors and gossip about Stahl's temper.  He did not know the specifics of the situation.  So while he did not disregard the information, he admits that he did not factor it into his score beyond general background knowledge about Stahl.  Standifer understood that Stahl had no supervisory experience within the TFD and that it would be difficult for an individual to fill the Division Chief of Operations position with no supervisory experience.  Yet, he gave Stahl all fours and fives as scores on his answers to questions.  His lowest rating on the end scale was for "Skills and Experience for Position," which he assigned a "Fair" rating.  Standifer's overall comment about Stahl was that he "did an excellent job in interview.  Vast amount of knowledge and historically has been involved in a lot of different things with the Dept."[24]

The panelists did not compare notes and did not discuss specific scores.  But they did generally talk about the candidates before scoring them.  Standifer testified that the other panelists generally asked him what he knew about each candidate, and that they discussed how

---

[22] *Id.* at 129:18–25.

[23] Ex. 28 at 7 (Doc. 79-29).

[24] Ex. 33 at 7 (Doc. 79-34).

long they had been on the job and generally the things each candidate did and did not do well during the interviews.

### *Decision*

Phillips made the final decision on the promotions.  After the interviews, he reviewed the information provided to him, including the interview scores and each applicant's experience, education, overall skills, and abilities.  He considered how each candidate's skills would best fit each Division Chief position.  He considered supervisory experience important.  Phillips totaled the scores both with and without Standifer's scores and noted that the top four candidates did not change.  Phillips spoke to Standifer before making a final decision and then decided to promote the top four scoring candidates.  This was the first time the TFD or any City department had ever combined open management positions and awarded the top four interview scorers the positions.

Before making promotion decisions, Phillips did not review the applicants' performance history or disciplinary file.  Had he reviewed Stahl's disciplinary history, he would have discovered an incident from 2020 when Stahl was moved to a different building based on unprofessional conduct and lack of professional integrity in response to a Chief moving his vehicle.  Stahl had also received a verbal warning for applying physical punishment to recruits in 2016.  Phillips was the President of the TFD Union at the time of the 2016 warning but did not know about this incident.

The following positions were offered and accepted: Broadbent for Division Chief of Operations, Gatewood for Division Chief of Administration, Stahl for Fire Marshal, and Andruss for Division Chief of EMS/Training.  All named Division Chiefs were white men.  Gatewood had only expressed interest in the Chief of Operations position, but Phillips believed

his skills were better suited to serve as Division Chief of Administration.  Although Gatewood
hesitated, he ultimately accepted that position.

### *H.R.'s Limited Involvement*

On April 15, 2022, the same day that Phillips extended the promotion offers, Russell sent
Phillips an email attaching Stahl's Notice of Discipline or Corrective Action from 2020, stating:
"Assuming you've already made your promotion offers, I just became aware of this discipline
and wanted you to be aware.  There may be concerns with promoting after demonstrating this
type of conduct in the workplace into a Division Chief (leadership) level of management."[25]  Had
Russell been involved in the hiring process earlier, she would have brought it to Phillips's
attention before April 15, 2022.  As it stood, Phillips was not aware of Stahl's disciplinary
history when he extended the offer to him, and he testified at deposition that even if he had
known about it, it would not have changed his decision to hire Stahl because a verbal reprimand
"is the lowest level of discipline within the progressive disciplinary policy . . . [and] I did not feel
that it warranted rescinding the offer that had been made to Alan."[26]

The promotion process for the Division Chiefs did not involve H.R. to the extent that was
typical for the TFD in several ways.  Typically, the hiring manager would inquire about
disciplinary and performance history for the applicants.  That did not happen here.  Typically,
after interviews, the hiring manager would submit all of the interview materials to H.R. for
review to ensure an objective selection was made before an offer is extended.  One example of
how H.R. would review the interview materials is that if there is a scoring outlier, H.R. may want
to inquire further of the panelist who assigned the outlier score.  That review did not happen here

---

[25] Ex. 59 (Doc. 88-3).

[26] Ex. 8, Phillips Dep. 254:23–255:2 (Doc. 79-9).

either.  On April 12, 2022, Maisberger sent Phillips an email advising him that Russell wanted to

know if he could provide his recommendations for the Division Chief positions before making

offers.  But H.R. did not receive any interview materials from the promotion process before the

offers were extended.

Russell was concerned that the typical process had not been followed here.  She relayed

her concern about deviating from standard practice to Phillips and Cochran and in fact asked

Cochran to be more involved in the hiring practice.  Russell was also concerned about applicants

not applying for specific Division Chief positions and potentially being hired for a position for

which they were not interested.[27]  Phillips testified that, despite Maisberger's email, he did not

understand he was required to seek review from HR before extending offers to the successful

candidates.[28]  But Cochran knew that "the main purpose of H.R. is to, one find people to fill

positions within the City, but then also to make sure that everything is done equitably and fairly

across the board."[29]

After losing the promotion to Division Chief, Plaintiff worked as a Training Officer for

another year.  She retired from the Topeka Fire Department, effective March 31, 2023.

---

[27] During Russell's deposition, she was provided with the interview packets for the first time to review. The parties took a break to give her time to review the packets.  After reviewing the interview packets, Russell identified Standifer's scores for Hack and Dorsey as outlier scores that she would have investigated further.  But she opined that an objective process had been followed given that the top four scores were offered promotions. Plaintiff's objection that Russell's opinion is as an undisclosed expert is sustained in part and overruled and denied in part.  To the extent Russell offers testimony based on her experience as a percipient witness and about her opinions on events that occurred when she was the H.R. manager, it is lay opinion. *See* Fed. R. Evid. 701; *ORP Surgical, LLC v. Howmedica Osteonics Corp.*, 92 F.4th 896, 915 (10th Cir. 2024) ("Witnesses with professional expertise may qualify as lay witnesses if their testimony pertains to personal experience or first-hand knowledge."). But to the extent she offers a post hoc opinion about the interview questions and results that she reviewed for the first time at her deposition, the Court agrees she lacks personal knowledge to offer lay opinion.  And because she has not been qualified as an expert, the Court disregards her post hoc opinion.

[28] The Court sustains Defendant's hearsay objection to Cochran's deposition testimony that Phillips expressed concern to him that H.R. "kept them handcuffed and wouldn't let them do things."  Ex. 53, Cochran dep. 41:11–15 (Doc. 87-8).

[29] *Id.* at 41:18–22.

### III.    Discussion

Only one claim remains in this matter: Plaintiff's claim of gender-based discrimination under Title VII when Defendant failed to promote her in 2022.[30]  The parties agree that Plaintiff does not present direct evidence of discrimination, so the familiar *McDonnell Douglas*[31] burden-shifting framework applies.  Under *McDonnell Douglas*, Plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[32]  The burden of establishing the prima facie case is "not onerous."[33]  If Plaintiff establishes a prima facie case, the burden shifts to Defendant to proffer a facially nondiscriminatory reason for its actions.[34]  If Defendant proffers a legitimate nondiscriminatory reason for its decision, the burden shifts back to Plaintiff to present evidence from which a jury might conclude that Defendant's proffered reason is pretextual, that is, "unworthy of belief."[35]  Although the burdens of production shift, the ultimate burden of persuading the trier of fact that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.[36]

Here, Defendant does not dispute that Plaintiff produced evidence to show a prima facie case of discrimination; thus, the burden shifts to Defendant to proffer a legitimate,

---

[30] Because Plaintiff does not allege a claim based on an adverse employment action that predates 300 days before her discrimination charge, Defendant's motion for summary judgment on the basis of failure to exhaust is moot.  Moreover, Plaintiff does not assert pattern-or-practice or disparate-impact claims, so Defendant's motion for summary judgment on these claims is also moot.

[31] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[32] *Id.* at 802.

[33] *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

[34] *Id.*

[35] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[36] *See Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010) ("Throughout the three-step process, '[t]he plaintiff . . . carries the full burden of persuasion to show that the defendant discriminated on [an] illegal basis.'" (alterations in original) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005))).

nondiscriminatory reason for its hiring decision.  Defendant meets its burden here—it proffered

evidence that it promoted the highest scoring candidates following an objective interview

process.  Thus, the burden shifts back to Plaintiff to demonstrate that this explanation is pretext

for gender-based discrimination.

There is no specific type of evidence required for an employment-discrimination plaintiff

to establish pretext.[37]  In general, "a plaintiff can establish pretext by showing the defendant's

proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent,

or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[38]  Here,

Plaintiff relies on the following evidence of pretext: (1) Standifer's discriminatory animus; (2)

procedural irregularities in the hiring process; and (3) the disparity in qualifications between

Plaintiff and the promoted candidates.  The Court addresses each in turn.

### A.    Standifer's Animus

Plaintiff offers evidence that she claims shows that Standifer, who sat on the interview

panel and was Phillips' deputy, held a gender bias that impacted the hiring decision.[39]  And

Plaintiff also argues that Standifer's animus should be imputed to Phillips, the final

decisionmaker, under a "cat's paw" theory.  This type of liability applies "if a subordinate to the

decisionmaker 'performs an act motivated by [discriminatory] animus that is *intended* by the

[subordinate] to cause an adverse employment action, and . . . that act is a proximate cause of the

---

[37] *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008).

[38] *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010) (alteration in original) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

[39] Plaintiff also asserts that this animus was based on race, impacting Dorsey.  Dorsey is an African-American male who filed a separate lawsuit against the City alleging race discrimination: *Dorsey v. City of Topeka*, Case No. 23-cv-2422-HLT (D. Kan. filed Sept. 18, 2023).  This Court does not consider whether Standifer also held a racial bias that impacted Dorsey; a question appropriately addressed in that separate case.

ultimate employment action.'"[40]  To withstand summary judgment on this theory, "a plaintiff must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action."[41]

Defendant argues there is no evidence that Standifer held a discriminatory animus and that even if he did, there is no evidence of proximate causation because Phillips based his decision on the scores from an independent interview panel, breaking the chain of causation.[42] Plaintiff relies on the following evidence to support Standifer's discriminatory animus: (1) the large discrepancy in his scoring of Hack and Dorsey versus the white male candidates that could not be objectively explained; (2) he shared his knowledge and opinion with the panel members that Hack was lazy; (3) he made a derogatory statement about women to Hack; (4) he made a derogatory statement about Kathy Petty, the only woman hired as a Division Chief in the last twenty years.

As an initial matter, the Court finds that Standifer's unidentified and undated derogatory comment to Plaintiff, and his comment about Petty, are stray comments that are insufficient to show discriminatory animus.[43]  A stray comment may show animus *if* there is a "nexus between

---

[40] *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019) (alterations in original) (quoting *Staub v. Proctor*, 562 U.S. 411, 422 (2011)).

[41] *Id.*

[42] *See id.* ("One way an employer can 'break the causal chain' between the subordinate's biased behavior and the adverse employment action is for another person or committee higher up in the decision-making process to independently investigate the grounds for dismissal." (quoting *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516 (10th Cir. 2015))).

[43] *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1281 (10th Cir. 2003) (quoting *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994)).

the allegedly discriminatory statements and the defendant's decision."[44]  But Plaintiff is unable to show these comments are linked to the employment decision.  Plaintiff does not remember the content or the date of the comment she claims Standifer made to her.  And Standifer's comment about Petty was made in a deposition and was not necessarily gender-specific—he said Petty had a reputation for being "a pain in the butt to work with," and he tried to avoid her.[45]  There is no nexus between this comment and the way that Standifer scored Plaintiff during the promotion process in 2022.

However, when the other evidence identified by Plaintiff is viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that Standifer's scores were motivated by discriminatory animus.  Standifer's scores were markedly lower for Plaintiff —by twelve points—compared to the white male candidates.  A reasonable jury could find that Standifer's explanations for these low scores were not credible, and that if H.R. had reviewed them, there would have at least been some investigation into the motivation behind those low scores.

First, Standifer explained in his deposition that the reason for Plaintiff's low scores was that Plaintiff was not energetic and did not seem to want the job.  But this explanation was at direct odds with the impressions of other members of the panel.  Patty observed in his comments that Plaintiff was a "[g]reat & enthusiastic firefighter!  Understands importance of female firefighters as role models."[46]  Anderson commented that she had a "Great interview.  Very personable."[47]  Patty and Anderson rated Plaintiff as "Excellent" and Jones rated her "Good" for her level of enthusiasm towards the position.  Standifer's own scores of Plaintiff also belie his

---

[44] *Id.* (quoting *Rea*, 29 F.3d at 1457).

[45] Ex. 19, Standifer Dep. 180:20–22 (Doc. 79-20).

[46] Ex. 28 at 3 (Doc. 79-29).

[47] *Id.* at 10.

deposition testimony that he found her to be unenergetic and that she did not present herself well. His lowest ratings of her were *not* for how she presented herself, or level of enthusiasm; he gave her "poor" ratings on her skill, experience, and knowledge for the job.

Second, Standifer's explanation and scores for Plaintiff are inconsistent with how he scored the other candidates. He testified that Andruss had a reputation for being unenergetic, yet Standifer gave him a score that was more than twice as high as Plaintiff's. And he testified that although he was aware of Stahl's disciplinary history, he set that aside for purposes of the interview. Standifer scored Stahl more than twice as high as Plaintiff despite knowledge of that history.

Third, Standifer admitted in his deposition that he held a low opinion of Plaintiff's work ethic, even though they had never worked together—he believed she had a reputation for doing the "bare minimum," although he admitted that this opinion was based on rumors and gossip. In contrast, although Standifer was aware of Stahl's disciplinary history through gossip, he was careful not to consider this in his scoring of Stahl. A reasonable jury could conclude that Standifer weighed rumor-based opinions of Plaintiff more heavily into his interview scores than he did those of Stahl.

Defendant next contends that Standifer's animus could not be the proximate cause of the promotion decision because there is no evidence he influenced the other panelists' scores and because Phillips decided to extend offers to the top four scorers, which would not have included Plaintiff even if Standifer's scores were omitted from the total calculation. But again, the Court must view the evidence in the light most favorable to the Plaintiff, and when doing so, a

reasonable jury could conclude that Plaintiff demonstrated a "causal chain between [Standifer's] allegedly biased input and the decision not to [promote] Plaintiff."[48]

First, Standifer was the only internal member on the interview panel, and he spoke to the other members of the panel in between interviews generally about his experience working with each applicant. While there is no evidence that he discussed scores with the other panelists, he admitted during his deposition that they asked him about the candidates he worked with and that they spoke in generalities about the candidates. He could not recall specifically what they discussed beyond that.

Second, Standifer's scores contributed to the overall scores of the panel; Russell testified that his scores would be considered outliers had H.R. reviewed them before the offers were made. Given those outliers, H.R. would have further investigated the interview scores to determine why Standifer's were so low for Plaintiff compared to the others. While Russell testified that she was satisfied during her deposition review with the scores, a reasonable jury could conclude that had a contemporaneous review occurred, rather than this hindsight, on-the-spot review during Russell's deposition, H.R. may have recalibrated the scores or advised Phillips differently.

Third, Phillips discussed the offers he intended to make with Standifer before extending them.[49] Although it is undisputed that Plaintiff would still be fifth in overall scoring even without Standifer's scores, the Court finds that Standifer's outsized impact on the interview process—as a member of the interview panel and a trusted advisor to Phillips—could lead a reasonable jury to conclude that his animus proximately caused Phillips' decision not to promote

---

[48] *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019).

[49] Ex. 19, Standifer Dep. 151:13–25 (Doc. 79-20).

Plaintiff based on those scores.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Standifer held a gender bias, that he intended to score Plaintiff low enough not to receive the promotion, and that his conduct proximately caused the promotion decision.

### B.      Procedural Irregularities

Plaintiff next argues that five procedural irregularities in the hiring process occurred that demonstrate pretext: (1) the City used a single streamlined process for hiring four Division Chiefs instead of using a separate process for each vacancy; (2) the City deviated from its two-year Captain requirement for the highest-scoring male applicant; (3) the weight given to past supervision and moving through the ranks of the TFD was different for each applicant; (4) the decisionmaker did not consider past disciplinary history of the candidates before making a decision; and (5) the TFD circumvented the City's H.R. Department during the hiring process.

Plaintiff is correct that "disturbing procedural irregularities, including deviations from normal company procedure, provide support for a plaintiff's assertion of pretext."[50]  But "[a] procedural irregularity evinces pretext only if it 'directly and uniquely disadvantaged a minority employee.'"[51]  The failure to follow the City's own internal procedures does not necessarily prove pretext if it disadvantages all potential job applicants.[52]

### 1.      Streamlined Interview Process

It is undisputed that City policy did not prevent the TFD from using a streamlined process for interviewing all applicants for all four Division chiefs and selecting the top four

---

[50] *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003).

[51] *Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 672 (10th Cir. 2019) (quoting *Johnson v. Weld County*, 594 F.3d 1202 (10th Cir. 2010)).

[52] *Randle v. City of Aurora*, 69 F.3d 441, 454 n.20 (10th Cir. 1995); *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1089 (10th Cir. 2023) (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1176 (10th Cir. 2013)).

scoring candidates.  But Russell was not aware of any precedent for using a streamlined process like the one Phillips used here, and when she brought those concerns to his attention, they were ignored.  While Phillips hoped the Division Chief positions could be interchangeable, there is evidence in the record that this was not a realistic expectation given the different roles and, to some degree, qualifications required for each position.  Nonetheless, this irregularity applied to all of the applicants—none of whom specified that they were interested in all four Division Chief positions.  Andruss and Gatewood were certainly impacted.  Andruss only intended to apply for the Division Chief of EMS/Training, and no other applicant specified interest in that position, the only one that required a paramedic certification.  Had the normal application process applied, he would not have had any competition for that position.  And Gatewood was offered a position that he did not intend to apply for.  After some thought and hesitation, he accepted.  The other applicants were  impacted by the streamlined process just as much as Plaintiff—each of the other three Division Chief positions had three applicants.  Thus, under the streamlined process, instead of each applicant competing against two other candidates for those positions, they were competing against seven.  Accordingly, the Court cannot find that this procedural irregularity uniquely and directly disadvantaged Plaintiff.

### 2.    Excepting Stahl from the Captain Requirement

The job postings for all Division Chief positions had a rank qualification of Captain or higher.  This was actually lower than the typical Battalion Chief qualification because of the uniquely high number of command position vacancies in the department at the time.  There is no genuine issue of material fact that the City and Phillips decided to lower the rank qualification in order to generate enough applicants to fill the positions.  Because the TFD also had Battalion

Chief vacancies, there were not enough existing Battalion Chiefs to promote into Division Chief vacancies.

Stahl was a Lieutenant in suppression before transferring to the specialty side, where he was a Level III officer at the time he applied for the Division Chief position.  Given that the Division Chief postings all required that applicants have two years' experience in the rank of Captain and did not say that equivalent experience would count, Stahl asked Standifer whether he was eligible to apply.  Standifer in turn asked Phillips.  Russell recalls speaking to either Phillips or Maisberger in H.R. about whether Stahl was qualified to apply even though he did not have a Captain rank.  Russell advised that Stahl was qualified due to his equivalent experience on the specialty side as a Level III officer.  During her deposition, she explained that the

> culture of the fire department is very suppression-focused.  But there are specialty positions that are not in fire suppression that have equivalencies to suppression ranks.  So the captain equivalent in the specialty positions for like training officer, investigator, inspector, would be the III level.  And if you look at their labor agreement, you'll see that the pay structure, the pay rates are the same for the Level III specialty positions as they are for the captain in suppression, and then II is equivalent to lieutenant and down.  So while the practice is that that is an equivalent to any specialty Level III.[53]

Based on H.R.'s guidance, Phillips believed Stahl was qualified and advised Standifer to allow Stahl to apply.

The Court must consider the facts "as they appear *to the person making the decision*" in examining pretext, that is, whether the employer's justification for its promotion decision is worthy of credence.[54]  Here, despite the fact that the job postings clearly required applicants to have been ranked Captain for two years, all parties involved in the hiring process believed that

---

[53] Ex. 9, Russell Dep. 29:14–30:5 (Doc. 79-10).

[54] *Conroy v. Vilsack*, 707 F.3d 1163, 1174 (10th Cir. 2013).

Stahl was qualified because the TFD had a practice of treating Level III specialty officers like Stahl as equivalent to a rank of Captain on the suppression side. There is no evidence that suggests Phillips allowed Stahl to be considered without H.R.'s approval. And it is undisputed that Phillips believed H.R. had determined that Stahl's experience on the specialty side was sufficient to qualify him.

The City's decision to allow Stahl, the top-scoring interviewee, to be considered did not uniquely impact Plaintiff any more than the other male candidates. All of the other candidates who had been ranked Captain were disadvantaged by the City's decision to allow Stahl's equivalent experience to qualify him. Thus, this procedural irregularity does not demonstrate pretext for discriminatory motive.

### 3.    Past Supervision Experience and Moving Through the Ranks

Relatedly, Plaintiff argues that there is a genuine issue of material fact about whether Phillips believed Stahl was qualified due to his lack of supervisory experience and failure to rise through the ranks on the suppression side of the TFD, regardless of what H.R. told him. The Court does not find that there is a genuine issue of material fact on this issue that would support a finding of pretext. First, unlike the Captain-rank requirement, there was nothing in the job postings that required a certain amount or type of supervisory experience. Phillips testified that he considered all supervisory experience when making his decision, not just TFD supervisory experience, and that he considered Stahl's supervisory experience with the Kansas National Guard as sufficient. There is no indication that this explanation was a pretext for discrimination. And again, any procedural irregularity inured to the detriment of all other candidates, not just Plaintiff, who all came from the suppression side of the TFD.

### 4.    Disciplinary History

Plaintiff next argues that Phillips's failure to examine the applicants' disciplinary history was a procedural irregularity that shows pretext. Russell testified it was common to consider an applicant's personnel file and two-year disciplinary history when hiring. She sent Phillips an email on the same day that he extended offers, attaching Stahl's 2020 disciplinary report where he received a verbal warning, and she advised Phillips in that email that this might be a problem given that he was applying for a leadership position. Plaintiff suggests that Phillips was aware of this email at the time he extended the offer to Stahl, but there is no evidence to support that inference. Phillips testified that he was not aware of Stahl's disciplinary incident from 2020 when he extended the job offer to him. Moreover, there is no evidence that Phillips's failure to consider Stahl's disciplinary history directly disadvantaged Plaintiff any more than the other male candidates. Thus, the Court cannot find that Phillips's failure to investigate Stahl's, or any other applicant's, disciplinary history is evidence that the stated reason for the promotion was not the true one.

### 5. Circumventing the City's H.R. Department

Finally, Plaintiff argues that Phillips circumvented H.R. at multiple turns during the Division Chief promotion process. Viewing the evidence in the light most favorable to Plaintiff, H.R. was indeed left out of the process in several important ways as compared to its usual role in hiring leadership positions for the City. It did not review and approve the interview questions or panel ahead of time; it did not review the interview packets before the offers were made; it was not asked to provide the applicants' personnel files or disciplinary history before offers were made; and it was not asked to sign off on the offers before they were made. Russell was concerned about each of these deviations from standard procedure. And she expressed her desire to be more involved multiple times but appears to have been ignored. Instead, Phillips worked

directly with Cochran, with the exception of asking for H.R.'s guidance about Stahl's lack of Captain-rank experience.  While Defendant is correct that there does not appear to be a written policy that required the TFD to utilize H.R. in a certain way, there is evidence that in practice H.R. had always been more involved in the process and that if H.R. was allowed to follow its normal protocol, it would have advised against the streamlined interview procedure, highlighted Stahl's disciplinary history to Phillips before decisions were made, and investigated Standifer's low scores for Plaintiff.

These deviations directly impacted Plaintiff because if the streamlined procedure was not used, she would have been competing against only Stahl and Dorsey for the Fire Marshal and Chief of Administration positions.  In Russell's April 15 email to Phillips, she not only attached Stahl's 2020 disciplinary report but advised Phillips that "[t]here may be concerns with promoting after demonstrating this type of conduct in the workplace into a Division Chief (leadership) level of management."[55]  If Stahl was not considered due to his disciplinary history, Plaintiff would have been the next highest scorer for those two positions if a streamlined process was not utilized.  Finally, if Russell had conducted an investigation into Standifer's scores, she may have determined that his outlier scores should not be relied on because they were based on intangible impressions of Plaintiff that were inconsistent with his other scores and the other panelists' scores.  A reasonable jury could conclude that Russell's review of the interview packets in the middle of her deposition testimony was not sufficient to reach an opinion that they were objective.

---

[55] Ex. 59 (Doc. 88-3).

In sum, the Court finds that the City's failure to utilize H.R. during the promotion process is the type of procedural irregularity that calls into question whether the City's stated reason for failing to promote Plaintiff is a pretext for discrimination.

### C.    Disparity in Qualifications

Finally, Plaintiff points to a disparity in qualifications between herself and Stahl.  "To show pretext, the disparity in qualifications must be overwhelming."[56]  The Circuit explains that this means the Court can "infer pretext only when the plaintiff can '*assure us* that the plaintiff is better qualified than the other candidates for the position.'"[57]  In proving an overwhelming disparity in qualifications, Plaintiff "must do more than offer 'mere self-serving appraisals.'"[58]  And the Court must consider "the competing candidates' qualifications only in light of the facts available to the decisionmaker at the time of the decision, not in light of facts that might have been apparent to others or that might have become apparent only in hindsight."[59]

In support of this pretext argument, Plaintiff argues that Stahl (1) did not meet the minimum qualifications of the job posting; (2) lacked supervisory experience; (3) had not risen through the ranks of suppression; and (4) had a "long disciplinary history and a well-established temper."[60]  The Court finds that this evidence fails to create a genuine issue of material fact about whether Plaintiff was overwhelmingly more qualified than Stahl for the Division Chief positions.

---

[56] *Mauldin v. Driscoll*, No. 24-7010, 2025 WL 1299686, at *9 (10th Cir. May 6, 2025) (quoting *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005)).

[57] *Ford v. Jackson Nat'l Life Ins.*, 45 F.4th 1202, 1219 (10th Cir. 2022) (quoting *Santana v. City and County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007)).

[58] *Id.* (quoting *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008)).

[59] *Johnson v. Weld County*, 594 F.3d 1202, 1211–12 (10th Cir. 2010).

[60] Doc. 87 at 50.

The postings required that applicants hold "the minimum rank of Captain for a minimum of two (2) years as well as twenty (20) years of firefighting experience.  Applicants must have an equivalent combination of education, training and/or experience . . . to successfully perform the essential duties of the job."[61]  According to Stahl's resume, which Phillips and the interview panel reviewed, he had been with the TFD for 23 years at that point, including 16 years in specialty, advancing to a Level III Fire Investigator, Training Officer, and Public Education Officer.  He did not supervise anyone in any of those roles, but Stahl's resume also lists ten years of service with the Kansas National Guard, during which he had management experience.  When Stahl transferred to specialty, he did so in the rank of Lieutenant in suppression.  As discussed earlier, H.R. determined that Stahl was qualified, despite the fact that he had not become Captain on the suppression side, due to his equivalent experience on the specialty side as a Level III officer.

Plaintiff had been promoted to Captain on the suppression side in 2019, and in January 2022, Plaintiff transferred to the specialty side as a Training Officer.  Like Stahl, she was paid at the highest level (Level III) in recognition of the equivalency to her rank as Captain.  While Stahl did not rise through the ranks on the suppression side, there is no evidence that this was required and no evidence that this lack of suppression experience made Plaintiff overwhelmingly more qualified than him for the Division Chief positions.  Phillips testified that while it was important that the Division Chief candidates have supervisory experience, it "was not specifically required that it had to be within the department."[62]  It is undisputed that Stahl had supervisory experience outside of the department during his time with the Kansas National Guard.

_____

[61] Ex. 22 (Doc. 79-23).

[62] Ex. 8, Phillips Dep. 108:9–17 (Doc. 79-9).

Finally, the Court cannot find record support for Plaintiff's claim that Stahl had a "long" disciplinary history and a bad temper. There were only two disciplinary incidents prior to his application, and under the union contract, the City could only consider incidents within two years of his application, leaving only the 2020 incident. Although a reasonable jury could certainly conclude that the 2020 incident was serious—he was found to have exhibited unprofessional conduct and moved to a different building—it cannot be characterized as a "long" history of disciplinary problems. Plaintiff has submitted evidence of two other disciplinary incidents with Stahl, but they took place after his promotion so they are immaterial to the decision in 2022 that he was qualified. The Court cannot find that Stahl's disciplinary history suffices to show an overwhelming difference in qualifications between him and Plaintiff. Moreover, Plaintiff fails to address any of the other applicants' qualifications; thus, the Court cannot conclude that Plaintiff is overwhelmingly better qualified than the other candidates for the Division Chief positions.

### D.    Totality of the Pretext Evidence

In assessing the issue of pretext, the Court is also mindful that "Title VII requires a plaintiff to come forward with evidence from which a jury could conclude that the defendants' behavior was the result of something more than a mistake—namely, discriminatory animus."[63] But it must not "look at each piece of evidence in isolation; rather, in assessing whether plaintiffs have shown pretext, [it is] obliged to consider their evidence in its totality."[64] Here, while the individual pieces of pretext evidence cut both ways, when viewed in their totality, the Court finds that Plaintiff has demonstrated a genuine issue of material fact about whether Defendant's stated reason for not promoting her—the interview scores—was a pretext for discrimination.

---

[63] *Orr v. City of Albuquerque*, 531 F.3d 1210, 1217 (10th Cir. 2008).

[64] *Id.* at 1215.

To be sure, several of the procedural irregularities Plaintiff identifies, standing alone, do not demonstrate pretext because they impacted all of the applicants for the four Division Chief positions equally, not just Plaintiff. And the Court does not find record support that Plaintiff was overwhelmingly more qualified than any of the other applicants that scored higher than her for the Division Chief positions. However, when the totality of the evidence is reviewed, including the minimal role played by the City's H.R. department, a reasonable jury could determine that the City's stated reason for not promoting Plaintiff is pretext for gender discrimination.

Phillips and Cochran had knowledge that H.R. should have played a bigger role in the process, yet did not allow it to. The evidence reflects that H.R.'s role was limited to being asked about whether Stahl was qualified to apply and providing a representative to sit in on the interviews but not to participate. H.R. was not used to review the interview questions or interview packets. H.R. was not used to review or provide Phillips with the applicants' disciplinary histories. H.R. was not used to review the selections before job offers were made. This was despite the fact that Russell asked to be more involved in the process, specifically asked to review the selections before job offers were extended, and provided Phillips with the disciplinary history for Stahl and suggested it may counsel against extending him an offer. Russell also testified that this was contrary to the typical role that H.R. plays in a promotion process such as this one. The fact that there were so many vacancies, which was undisputably a unique situation, makes the TFD's failure to rely on H.R. even more implausible. In particular, a reasonable jury could conclude that the decision not to allow H.R. to investigate the interview scoring avoided scrutiny of Standifer's outlier scores of Plaintiff and Dorsey, scores that Russell said deserved further investigation.

As Cochran testified, the purpose of H.R.'s role in the process was "to make sure that everything is done equitably and fairly across the board." As the Tenth Circuit has explained, "[i]t is merely commonsense to infer that the explanation is pretextual if the evaluation of the employee bypassed standard procedures that protect an employee from unfair and biased decision-making."[65] Here, the summary-judgment record supports Plaintiff's contention that several standard procedures (even if not formal) were bypassed during the promotion process; and that when taken together, suggest Defendant's objective reason for the promotion decisions was not true, and that the process was designed to preclude Plaintiff from having a fair shot at the two jobs she applied for. When combined with evidence of Standifer's animus and its impact on the interview process and Phillips's final decision, the Court finds that Plaintiff has met her burden of producing evidence that supports an inference of pretext. Therefore, summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the City's Motion for Summary Judgment (Doc. 79) is **denied**. The Court will be in contact with the parties to set a conference to discuss a trial date and pretrial filing deadlines.

**IT IS SO ORDERED.**

Dated: May 30, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[65] *Kincaid v. Unified Sch. Dist. No. 500*, 94 F.4th 936, 949 (10th Cir. 2024).